MAE CADWELL HAYWARD ET AL., EXECUTORS AND
TRUSTEES, *vs.* MAE CADWELL HAYWARD ET AL.

Second Judicial District, Norwich, April Term, 1920.
PRENTICE, C. J., WHEELER, BEACH, GAGER and CASE, Js.

A testator whose estate amounted to $30,000,000 or more, left the bulk
of it in trust, the income of one third thereof to be paid to his wife
during her life, with power to dispose of the principal of such third
by her will, failing which it was to pass to the testator's next of
kin; one half of the trust fund was to be held for the benefit of the
testator's son and only child, Henry, who was to receive the accru-
ing income at the hands of the trustees, and the principal, also, in
four equal instalments, as he arrived at twenty-five, thirty, thirty-
five and forty years of age, with provision for his issue in case he
should die before reaching forty, and with power of disposition
by will in case of his death without issue; and the other one sixth

Hayward v. Hayward.

of the fund was to be held for the benefit of the testator's adopted son, Philip (a child of the testator's surviving wife by a former marriage), the income being payable to him by the trustees, and the principal also as he reached the ages prescribed for the testator's own son. The tenth paragraph of the will directed the trustees "to continue to maintain my home at Eastern Point, with all its appurtenances, so long as my son Henry may wish to occupy the same as a permanent or summer residence, and to charge the extent of such maintenance proportionately against the income of the trusts hereby created for the benefit of my wife and sons, before ascertaining the net income from such trusts." In a suit to construe the will it was *held:*—

1. That by "home, with all its appurtenances," the testator intended to include all his land at Eastern Point, comprising two large tracts upon opposite sides of the highway which he had formed and developed at very great expense, together with all the costly buildings and other improvements thereon; in other words, the whole property used by him for his own residential purposes and everything belonging thereto.

2. That the duty of the trustees, "to continue to maintain" this property, required them to do something more than merely preserve it in a condition fit for occupancy and prevent it from falling into decay; that it involved, in addition, such care and attention as might be reasonably necessary to preserve the property in substantially the same physical condition in which it existed at the testator's death.

3. That the apportionment of the burden of this maintenance and operation prescribed by the will, viz: one third upon the interest of the surviving wife, one half upon the interest of the testator's son, Henry, and one sixth upon the interest of his adopted son, Philip, was to remain fixed and constant; since an apportionment resting on a variable or changing basis would in all probability lead to results contrary to the testator's purpose and defeat the underlying scheme of his benefactions.

4. That the furniture and furnishings in both of the testator's dwelling-houses at Eastern Point were included in the property to be maintained by the trustees for Henry's use; and that such maintenance would involve their renewal when made necessary by wear or damage.

5. That the trustees, like any landlord, were bound, as a part of their duty of maintenance, to pay the taxes assessed upon the property.

6. That while the son Henry was not occupying the premises, the trustees were not required to pay the cost of operating the greenhouses or of heating them, except in so far as that might be necessary in the care of the trees or plants forming a part of the equipment of the Italian garden or other portions of the property.

7. That the expense of carrying on the testator's farms, which the trustees were authorized by the eleventh clause of the will to operate although not pecuniarily profitable, was likewise to be charged against the three trusts and in proportion to the interests of the respective beneficiaries, so long as the trustees saw fit to operate them in aid of the agricultural development of the country.

Argued April 27th—decided July 20th, 1920.

SUIT to determine the construction of the will of Morton F. Plant of Groton, deceased, brought to and reserved by the Superior Court in New London County, *Kellogg, J.,* upon the facts stated in the pleadings, for the advice of this court.

Morton F. Plant, a resident of Groton, died November 4th, 1918, leaving an estate estimated at upward of $30,000,000 and a will, dated October 16th, 1918, and duly probated. There survived him his wife, now Mae Cadwell Hayward, a son, Henry Bradley Plant, the issue of his former marriage, and an adopted son, Philip Morgan Plant, who is the son of his surviving wife by her former marriage. His will, of considerable length, contains in its first five paragraphs gifts to various institutions and individuals of money amounting to some $575,000, and also of specific property. In the sixth paragraph the rest, residue and remainder of his estate is given to the executors in trust for the following purposes and uses:—

One third of it to be held by them for the benefit of the wife during her life, she to receive its income during that time and have the power of disposal of the principal by will. In the event of the failure of such disposition the principal was to pass to the testator's next of kin.

From the remaining two thirds, sufficient sums to care in perpetuity for his family burial lot in New London, and to secure the annual payment of $5,000 to a Mrs. Noyer during her life, were to be set apart for these

purposes, and three fourths of the remainder was to be held for the benefit of his son and only child, Henry Bradley Plant, he to receive the accruing income coming into the hands of the trustees, and the principal in four instalments, to wit, one fourth on his arriving at the age of twenty-five, one third of the balance on his becoming thirty, one half of what remained at thirty-five, and the final portion at forty. Provision was also made in favor of Henry's issue should he die before reaching the age of forty, and he was given the power of disposition in case of his death without issue.

One fourth of the two thirds (reduced by the two inconsequential amounts as above indicated) was to be held for the benefit of the adopted son, Philip, upon substantially the same terms and conditions provided in the case of Henry's three-quarters share.

The remaining paragraphs of the will authorize the trustees to hold the trust estate without division, if they so elect, provide that the gift to the widow should be in lieu of dower, empower the executors and trustees in sundry matters of detail, and give various directions to them touching the management of the trust created by the will. These paragraphs possess no present importance except the tenth and eleventh paragraphs, which are as follows:—

"TENTH. I direct my trustees to continue to maintain my home at Eastern Point, Connecticut, with all its appurtenances so long as my son Henry Bradley Plant may wish to occupy the same as a permanent or summer residence and to charge the expense of such maintenance proportionately against the income of the trusts hereby created for the benefit of my wife and sons, before ascertaining the net income from such trusts.

"ELEVENTH. I authorize my trustees to continue to operate my farms, now known as Branford Farms, so long as they may deem it beneficial to the agri-

cultural development of the country to do so although such operation may not be profitable and I direct that any expense of such operation be charged proportionately against the income of the trusts hereby created for the benefit of my wife and sons before ascertaining the net income from such trusts."

The testator at the time of his death owned thirty-four original parcels of real estate in Groton, purchased by him of various persons and at various times beginning in 1902. Some of these were located entirely separate and apart from the others. Nine of them were so located, contiguous to each other, that they were capable, by the removal of walls and fences, of being thrown together and formed into one entire tract, separated in no other way than by a highway running through it from west to east. A tenth tract consists of a small island a little distance from the shore and immediately in front of the land last described.

After Mr. Plant's acquisition of these nine mainland properties, he took down the division walls and fences and built a stone wall around the land south of the road and another around that lying north of it. These two tracts he proceeded at great expense to develop for his residential purpose. He erected buildings upon them all adapted for use in combination for this purpose, and afterward as long as he lived so used them. Upon the land south of the highway and that portion of it comprised in his first purchase, he, during the years 1903 to 1905, erected a large mansion house which he called "Branford House." This was the first building erected by him. In connection therewith he constructed of pink Tennessee marble an elaborate so-called Italian garden costing $150,000 and more. This garden contains a large number of orange trees and various plants in pots and tubs which, being non-hardy, have for their protection to be placed indoors

and in a heated building throughout the season of cold weather. Other structures were erected by him from time to time on the land south of the highway and forming a group somewhat separated from the Branford House and nearer the highway. This group consisted of greenhouses, a barn, stable, power-house, bay house and laundry, and a porter's lodge. The cost to Mr. Plant of this property, grounds and buildings, was over $1,500,000. On the land across the highway he built a so-called "Bungalow," which, in fact, was a by-no-means mean residence, costing substantially $170,000, and there were, or were built by him upon this piece, five other buildings. Three of these he used as houses where servants employed by him in or about the Branford House resided, a fourth for the lodging and feeding of men who worked in the greenhouses, and the fifth for a central office occupied by the person having general charge of the Plant property in Groton including the Branford House and grounds. On this piece north of the road when he purchased it was an ice pond. This he deepened and cleared, constructed an island therein, and stocked it with fancy fowl.

Branford House was the principal residence of Mr. Plant up to the time of his death. It was expensively furnished at a cost of more than one half a million dollars. The so-called "Bungalow" is a fully furnished and equipped dwelling-house containing fifteen rooms. During portions of the year, amounting to at least six weeks on the average, each fall and spring covering the time when Branford House was being opened and closed, Mr. Plant occupied this bungalow. During the winter season, which he customarily spent in New York, the larger house was closed and the Bungalow kept in readiness and heated for immediate occupancy by Mr. Plant or members of his family, should they desire to make winter visits, as they sometimes did.

During the periods when the Bungalow was occupied as stated, the family made use of the garage, stable, greenhouses and other outbuildings standing on the tract south of the highway. There were no separate out-buildings designed for use in connection with the Bungalow. The latter building has never been used except for the purposes above indicated, and the two enclosed tracts above described with the buildings therein have always been used and managed by Mr. Plant as one property, some of the same servants being employed alternately at the Bungalow, at the Branford House, or on or about any portion of the grounds. The expenditure accounts for the upkeep of these grounds and buildings, including taxes, insurance, water bills, painting, carpenter work and sundry supplies, were kept separate from those relating to other Groton properties owned by Mr. Plant. Exclusive of living expenses, they amounted to over $83,000 annually for the years 1916, 1917 and 1918.

For some years prior to and at his death Mr. Plant owned other property consisting of about 400 acres located in Groton and about 300 acres in East Lyme. This property was used by him for farming purposes. That portion of it which lay in Groton was and had for several years been used by him for general farming, as a cattle and dairy farm and a portion of it for the raising of vegetables and poultry. The land in East Lyme was used by him for general farming and as a swine and sheep farm. These farm lands in Groton and East Lyme were operated under the name of "Branford Farms." Upon them he constructed many buildings used in the conduct of the farms, and had thereon an extensive and expensive equipment and much valuable stock. His operation of the farm for the years 1916, 1917 and 1918 had resulted in an average loss per year of upward of $96,000.

Henry Bradley Plant will become twenty-five years of age on May 18th, 1920, and Philip Morgan Plant on August 24th, 1926. The following questions are reserved for advice:—

"First. Whether the provisions of Article Tenth of said will include the house known as the Bungalow, including the lake and buildings standing adjacent thereto and heretofore described in paragraph number 4.

"Second. As to the meaning of the term "home" in Article Tenth of said will.

"Third. As to what property or properties the provisions of Article Tenth of said will include and refer to.

"Fourth. Whether the provisions of Article Tenth of said will refer to and include the furniture and furnishings in said Branford House, and in the Bungalow, providing the latter be included in said provisions.

"Fifth. Whether the provisions of Article Tenth of said will do more than require the trustees to keep the buildings and premises in repair so as to prevent damage and deterioration and what they do require in such connection.

"Sixth. Whether the provisions of Article Tenth of said will require the trustees to pay the cost of operating the greenhouses connected with Branford House during the time said Henry Bradley Plant is not occupying the premises or during any other time.

"Seventh. Whether the provisions of Article Tenth of said will require the trustees to renew furniture and furnishings as the same may be damaged, worn, or worn out.

"Eighth. As to the meaning of the term 'maintain' in Article Tenth of said will.

"Ninth. Whether the provisions of Article Tenth of said will require the trustees to pay the taxes upon the property which is to be maintained thereunder

out of the income of the trusts created for the benefit of the wife and sons of the testator before ascertaining the net income thereof.

"Tenth. Whether the expense of maintaining the home of the testator for the use of the defendant Henry Bradley Plant as provided in Article Tenth of said will is always to be charged against the income of the trusts created for the benefit of the wife and sons in the proportions existing at the commencement of the trusts or whether the proportions are to be changed as distributions are made to the sons under the provisions of Article Sixth of said will.

"Eleventh. Whether the expense of the operation of the farms known as Branford Farms as provided in Article Eleventh of said will is always to be charged against the income of the trusts created for the benefit of the wife and sons in the proportions existing at the commencement of the trusts or whether the proportions are to be changed as distributions are made to the sons under the provisions of Article Sixth of said will."

*Charles B. Whittlesey,* for the plaintiffs.

*Walter C. Noyes* of New York City, for the defendants Mae Cadwell Hayward and Philip Morgan Plant.

*Christopher L. Avery,* with whom, on the brief, was *Charles B. Waller,* for the defendants Henry Bradley Plant and Amy Capron Plant.

PRENTICE, C. J. The plaintiffs, trustees under the will of Morton F. Plant, seek from the Superior Court advice concerning their duty in the execution of his directions contained in the tenth and eleventh paragraphs of his will. The concrete questions presented for

answer are eleven in number. Ten of them grow out of the provisions of the former paragraph, and one out of those of the latter. When, however, these questions are examined and analyzed, they will be found to embody three fundamental inquiries whose answers either supply or point quite unmistakably to the answers to be given to all of the questions upon which advice is sought. These fundamental questions are:—

(1) What property did the words "my home at Eastern Point, Connecticut, with all its appurtenances," as they are used in the tenth paragraph of the will, embrace?

(2) What is the extent of the duty of maintenance which is cast upon the trustees as respects the property thus described?

(3) How and in what proportions, as between different interests, is the expense incurred by the trustees in complying with the testator's directions as to the maintenance of property contained in paragraph ten, and as to the operation of "Branford Farms" contained in paragraph eleven, to be borne?

Reading the tenth paragraph in connection with the rest of the will and in the light of the circumstances surrounding the testator when he made it, there can be little doubt that his purpose and intent in using the language employed to describe the property which he directed should be maintained for the occupancy of his son and only child during his life or as long as he should wish to occupy it, was that it should embrace all of his Eastern Point property lying south of the highway and upon which stands the Branford House, that north of the highway upon which the so-called "Bungalow" is located, and the island lying off-shore and a short distance removed from the shore property above described; or, in other words, the entire property comprising the ten original tracts designated upon

the map incorporated in the record by reference as tracts A to J, inclusive.

This property was manifestly planned and developed to constitute an entirety and as such entirety to serve the testator as his place of residence—his home. It was so used by him until his death. Clearly the planning and execution of the plan had in view, as their controlling idea, that a completely appointed place of residence suited to the tastes and desires of a multimillionaire might be created. Each constituent part was designed to serve some purpose in the accomplishment of that result, and bore some relation to that result. Each was regarded as a part, and only as a part, of an entirety, and in fact played such part as long as Mr. Plant lived. With such a history and such a purpose directing that history it was natural, if not well-nigh inevitable, that Mr. Plant should come to regard this product of his thought and care in its entirety as his home. The whole plant furnished and equipped as it was for his residential purposes doubtless represented in his thought his home—his home in the intimate and comprehensive sense which that word implies as distinguished from more formal and common property descriptions. He had created it all to serve the purpose of his home; and had enjoyed it for that purpose. No one spot in it, doubtless, was to him less a part of his home plant than another. It all together comprised that plant of which its several portions were interrelated and constituent parts of the whole.

The presence of the highway running through the tract creating the outward appearance of two tracts is merely an accidental incident of no real significance as establishing a line of division between that lying north and that south of it. The whole tract is as much one and entire for all practical purposes as it would be if the easement of public travel was not there. It

would, of course, be possible to separate the north from the south piece and utilize each in the future independently. The inevitable result of such separation, however, would be that neither portion would afford complete facilities for a residential use commensurate with the character of the property or comparable with the testator's use. It is scarcely conceivable that the testator, who had developed this extensive plant at great expense and elaborately fitted and equipped it as a whole to serve his purposes as a place of residence, and doubtless took pride in his achievement, when providing for its maintenance after his death—or at least the maintenance of some portion of it—for his only child,—should, with his ample fortune, deliberately plan and provide for a property-disposition which would work the undoing, in some measure at least, of his labor of years, and the disruption of that which his thought and care had brought into existence.

Did these considerations leading to the conclusion that Mr. Plant used the language of his will in the inclusive sense above indicated, call for reinforcement, it might be found in the language itself. Had he intended, as certain of the interested parties claim, to describe the premises upon which the Branford House stands only, or any other portion less than the whole of the Eastern Point property, he quite certainly would have used language other than that which he did use; and the particular language employed by him, to wit, "my home at Eastern Point, Connecticut, with all its appurtenances," however apt or inapt the word "appurtenances" therein used may in its strict technical sense be said to be, is certainly very suggestive of a purpose and intent on the part of the testator to include within the scope and meaning of his descriptive language the whole property used by him for his residential purposes and everything belonging to it.

The duty of maintenance imposed upon the trustees is a more comprehensive one than that of merely preserving the property in a condition fit for occupancy, or that of making such repairs as may from time to time be necessary to prevent it falling into decay. It involves keeping it in a condition which should reasonably conform to the standard set by the testator in his lifetime and down to the time of his death. The injunction to maintain the property was one to preserve it in substantially the same physical condition it was in when it passed out of the testator's hands at his death. The duty imposed upon the trustees, therefore, includes not only that of repair in order to restore where there has been deterioration, but also such care and attention as may be reasonably necessary to prevent deterioration, and that of replacement where it becomes necessary by reason of ravages of time, the elements, or use, in order that pre-existing conditions may be reasonably maintained.

The position that the trustees occupy is analogous to that of a landlord under the obligation of maintaining the existing condition of leased property, and that of the son, Henry, to that of a tenant exempt from the payment of rent but entitled to have the property conditions preserved by his landlord. The expenses incident to occupancy are to be borne by the son: those involved in maintenance by the trustees.

The property which was entrusted to the care and keeping of the trustees with the injunction that it be maintained by them, was property of an exceptionally high grade character, fitted, furnished and equipped for the occupancy of persons of large means and extravagant tastes. It was to be maintained for the use of the testator's son and only child, who was the inheritor from the testator of a vast estate. Whether or no the testator took pride, as he quite likely did, in

providing for the continuance of this notable property as a sort of memorial of himself, it is quite certain that he did not contemplate or provide for a niggardly maintenance, or one which would not preserve the property in substantially the same condition it was in at his death.

The third of our questions finds its answer in part, in the express language of the two paragraphs under review, where it is provided that the expense of maintaining the property and operating the farms should be charged against the income of the trusts created in the will for the benefit of the testator's wife and sons. These trusts are, of course, those created in the residue and remainder of the testator's estate given to the trustees to be held by them primarily for the benefit of the wife, son and adopted son, in the proportions of one third, one half and one sixth respectively. This statement of proportions, while not strictly accurate by reason of the disposition made of two comparatively insignificant sums which were to come out of the shares of the two sons, is practically so by reason of the inconsequential character of the variations caused thereby which may, for convenience sake, be disregarded in our consideration of the proportions.

The burden of the cost of maintenance is thus cast upon the income of the trust fund or funds, and forms a charge upon that income taking precedence of all claims of beneficiaries of income to the extent that its priority exists. As there are three persons who, in different proportions, are privileged to share in the income produced by the residue property, it becomes necessary to know in what way this burden of expense is to be borne. The will settles that question, also, to the extent of saying that it shall be charged "proportionately" against the income of the trusts created for the benefit of the testator's wife and sons.

Under the conditions existing when the testator died, and which continued down to the time when this case was argued before us, there could be no doubt that one third of the cost of maintenance would be chargeable to the wife's share of income, one half to the son's, and one sixth to the adopted son's. This result, accepted by all the interested parties as correct, would be accomplished, if the residue fund was not divided, by the simple process of charging the outlay to the total net income of the fund, and distributing the balance in the proportions stated. If, on the other hand, the total fund be divided by the trustees into three funds assigned to the several income beneficiaries, the proper distribution of the burden would be cast by charging the income derived from each subordinate fund thus created with the proportion of expense stated.

But the conditions referred to will not be permanent. The provisions of the will with respect to the one-third portion of the principal representing the wife's beneficial share of the trust fund, and with respect to the payments of principal to the sons as they respectively reach certain ages, render it inevitable that in the course of time the proportions of income-producing principal in the hands of the trustees belonging to the several interests will be materially changed and frequently changing. In fact, the time has at this writing already come when the son Henry's arrival at the age of twenty-five years has begun the process of change. It is easy to surmise that the process thus begun might in the by no means unnatural order of events continue until, if the directions of the will be obeyed in disregard of the effect of paragraphs ten and eleven upon them, the only portion of the residue fund remaining in the hands of the trustees would be that, or some portion of that, set apart to the adopted son's share.

The vitally important question not specifically

answered by the will, therefore, arises as to whether the proportional division of income directed by the testator is one that remains constant in its proportions, or is a variable one whose proportions are to be fixed from time to time upon the basis of the amount of principal belonging to each of the three interests which produces the income which the trustees receive, or, if a division into three funds is made, upon the basis of the amount of income produced by each.

Before pursuing further the consideration of the question thus presented, it is pertinent to note that by force of the provisions of paragraph seven the trustees are empowered to maintain the residue fund as one undivided fund, or as three separate funds appropriated and set apart to the three income beneficiaries respectively. Whichever of these courses the trustees adopt, the practical results, in so far as the rights of the beneficiaries are concerned, are the same. Whatever is done, there are in effect three trust funds created: one for the benefit of each of the residue-income beneficiaries. It will, perhaps, serve to clarify the situation and simplify our consideration of it, if we hereafter treat the subject under discussion as involving three funds.

We are of the opinion that the position first hereinbefore stated, that the apportionment of the burden of property maintenance and operation is to remain a fixed and constant one, is correct. A division upon the other variable basis might well, and in all human probability would, lead to results quite contrary to the testator's purposes as they are revealed in his will, and accomplish the defeat of the underlying scheme of his benefactions. That scheme and these purposes are clearly shown. They were that the testator's net estate, subject to the charge of property maintenance and farm operation, was to pass in beneficial enjoy-

ment to his wife, son, and adopted son, in fixed proportions. We are able to discover no provision of the will modifying that situation unless it be found by interpretation at the point under consideration. If the claimed interpretation requiring the use of variable proportions be adopted, radical modifications are imported into the testator's scheme of disposition. The modifications would be not alone radical, but also most uncertain in their operation and effect. Some one or two of the three income beneficiaries would most surely be greatly advantaged or disadvantaged by its operation. Which one or ones would be benefited and which harmed, no one can guess even now, and the testator was equally in the dark upon that subject. He certainly did not intend to so far upset his general testamentary scheme and purpose as to commit the disposition of a considerable portion of the income of his estate to the chance fortunes of so bold a lottery as would result. Neither is it to be readily believed that he provided for so radical a modification of that scheme as the variable basis would quite surely import into it.

We are of the opinion, therefore, that the expense of maintenance and operation provided for in, or permitted by, paragraphs ten and eleven of the will, is to be borne by the income of the three funds in constant proportions determined as of the death of the testator, and being, substantially, one third by the income of the fund for the benefit of the wife, one half by the income of the fund for the benefit of the son Henry, and one sixth by the income of the fund for the benefit of the testator's adopted son Philip. These burdens constitute a charge upon the income, and, through the income, upon the principal of these funds respectively, to the extent thus indicated.

It remains to notice four incidental questions propounded for advice, whose answers are not specifically

given in the foregoing consideration of the major questions thus far discussed. Their answers and the reasons therefor, however, are sufficiently indicated in what has already been said to excuse further discussion which would be substantially repetitious.

The furniture and furnishings in the Branford House and the Bungalow are included in the property to be maintained by the trustees for the use of the son Henry. The maintenance of that portion of the property extends to renewal as the same may become damaged, worn, or worn out. The trustees, like any landlord, are to pay the taxes assessed upon the property as involved in their duty of maintenance. They are not required to pay the cost of operating the greenhouses or heating them during the time that the son is not occupying the premises except in so far as such operation and heating may be necessary in the care of the trees or plants forming a part of the equipment of the Italian garden or other portions of the premises. The operation of those structures under other conditions belongs to the burden incident to occupancy and use.

The Superior Court is advised to answer questions one, four, seven and nine in the affirmative, question six in the negative with the qualification above stated, and the remaining questions in accordance with this opinion.

No costs in this court will be taxed in favor of either party.

In this opinion the other judges concurred.